UNITED STATES, Appellee

v.

ANGEL B. BENAVIDES, Corporal,
U. S. Army, Appellant
2 USCMA 226, 8 CMR 26

No. 876

Decided February 20 1953

LT COL James C. Hamilton, U. S. Army, for Appellant.

LT COL Thayer Chapman, U S. Army, and 1ST LT Eugene L. Grimm, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted by general court-martial in Korea of the premeditated murder of a Korean national and was sentenced to dishonorable discharge, total forfeiture of pay, and life imprisonment. The findings and sentence have been upheld on review. We granted the accused's petition, limited to the issue of the sufficiency of the law officer's instructions. Disposition of this issue requires that the facts be set out in some detail.

On the evening of July 21, 1951, Private James O. Jones, was on guard duty at the entrance to a company bivouac area. Shortly before 7:00 p.m. a Korean truck drew near his post; the accused dismounted and, approaching Jones, asked him if he knew a certain Korean woman. Accused explained that "he was concerned about her having beat him out of ninety dollars and he had been in love with her and wanted to marry her, and that if he ever found her he would kill her."

Accused was carrying a .45 caliber automatic pistol which he offered to sell to Private Jones. While discussing the offer, Jones drew back the slide, eject-

**227**

ing a round from the chamber, examined the weapon and then returned it to the accused who replaced the magazine which he had previously removed. His attempt to complete the sale being unsuccessful, the accused departed. According to Jones, the accused "seemed to me to be drunk" because of the way he "weaved on his feet and his speech was slurred."

A few minutes later the accused walked into a Korean house located approximately 200 to 500 yards from the bivouac area. There were three soldiers and three Korean women in the house. One of the women was the one sought by the accused. According to one of the soldiers, Corporal Austin B. Dela Cruz, who viewed the entire incident, the following occurred: As the accused entered the house he brandished a pistol and asked the woman, "What the hell you doing, all these people around here"? An argument then ensued after which accused and the woman left the house. They were gone approximately fifteen minutes and upon returning, the accused ordered the woman to get her things together as she was going to accompany him. The prosecution witness, Private Castellano, one of the soldiers with Dela Cruz, testified that at this time the accused "had a .45 in his hand with the hammer back." Upon seeing the weapon this witness hastily left the room. As the accused and the woman prepared to go, accused began to argue with one of the other girls and was heard to say, "I'm going to shoot you, you're the one that's brought the girl around this place." At this the accused's girl friend intervened saying, "If you got mad I don't want to come with you." Accused then pointed the gun at her, and she said: "Then you shoot me if you want to." Thereupon, the accused shot her. The girl slumped to the floor and lay motionless. The accused put the pistol away and as he walked out said, "She asked for it—she got it."

Dela Cruz and Castellano described the victim as being about thirty years of age, five feet four in height, weighing approximately 120 pounds, black hair and "heavily busted."

Upon cross-examination Dela Cruz stated that after entering the house, the accused replaced the pistol in the holster, at which time the hammer was back, but that when talking with the woman he again had the gun in his hand. He further testified, by demonstration, that at the time accused fired the shot he held the gun in his right hand "almost level with his shoulder" and drawn back towards his chest. Although the accused's eyes were red, he looked sober to this witness. Castellano stated that the accused looked "real angry" but "couldn't say that he was drunk."

The accused was apprehended at approximately 7:00 p.m. by a three-man patrol. He was "dazed," his fatigues were "wet and damp" and he did not offer any resistance when he was relieved of his pistol. Sergeant Hester, the leader of the patrol testified, "When I took the weapon into the orderly room I smelled the barrel and showed it to the First Sergeant and it had been fired recently."

Captain Michael Limosani, a medical officer, United States Army, testified that at 3:00 a.m., July 22, 1951, near the company bivouac area previously mentioned, he examined the body of a dead Korean woman. He described her as having black hair, being approximately twenty-five years old and five feet tall and weighing approximately 100 pounds. His examination revealed that the woman had been shot; the bullet entering at a point on the lower jaw, proceeding through the roof of the oral cavity, and penetrating the brain stem causing immediate death.

Upon cross-examination, Captain Limosani was asked whether in his opinion it was possible for the fatal wound to have been inflicted if the principals were in the positions described by Dela Cruz. Based upon the hypothetical situations proposed to him, he stated variously that it was "possible but not probable," and that it was "not possible." He also stated that such a wound could have been inflicted if the victim had been kneeling and the shot fired from the accused's hip. Sergeant Robert J. Patterson, a CID agent, also

examined the dead body of a Korean woman in the vicinity in question on July 22, 1951. He corroborated in substance the medical officer's testimony as to the woman's physical characteristics, the description of the wound, and the path of the bullet.

At approximately 10.00 p.m. on July 22, 1951, the accused was interrogated by Sergeant Patterson and Agent Shepherd. Sergeant Patterson testified that after identifying themselves as CID agents, they read and explained the 31st Article, 50 U.S.C. § 602, to the accused and ascertained that he clearly understood it. Subsequently the accused made an oral statement, which he reduced to writing the next morning. This statement was received into evidence.

After being advised of his rights as a witness by the law officer, the accused elected to take the stand. He stated that he had been drinking whiskey the morning of July 22 and also "had finished drinking some beer after supper." He later met some Koreans and joined them in drinking some Korean wine after which he and the Koreans proceeded, by truck, to the company bivouac area. There he discussed with a soldier his wish to sell his weapon, a .45 caliber pistol, to the soldier's first sergeant. After inquiring if there were any girls in the vicinity, accused was directed to a nearby house where he found his girl friend, who was supposed to be in Seoul. There were two other Korean girls in the house, and also an American soldier, a Filipino. The accused hugged his girl friend and they then took a walk, being gone from the house approximately ten minutes. Before going back in the house the girl agreed to go with the accused. Upon re-entering the house, the girl started to pack her clothes. Accused asked one of the other Korean girls why she and his girl friend had not gone to Seoul and this girl responded that they "couldn't get a ride or something like that." The accused continued: "And then . . . she got angry or something or other and she said that if I wouldn't stop arguing— and I don't think I was arguing. I don't remember arguing, and she said that if I wouldn't stop arguing, that she wasn't going with me, that I could shoot her if I wanted to. Well, I like a darn fool, I started to pull out the pistol, it went off." Accused stated that at the time he shot her she was in a squatting position "still fooling with her bundle of clothes." The pistol had been in his holster "at all times" prior to the actual shooting. He then left the house and made an attempt to drown himself because he had killed a woman, but as he testified, "I didn't do a very good job of it." Shortly thereafter he was picked up. He did not mean to shoot the girl and had told Dela Cruz that he didn't know the gun was loaded. Because of his intoxicated condition he could not remember anything else. This account was substantially the same as that contained in the accused's written statement.

Three members of the accused's unit at the time of the alleged offense, all of whom had known accused over two years, testified that his reputation for peacefulness and truth and veracity was good.

At the close of the case, the law officer instructed the court fully on the elements of both premeditated and unpremeditated murder. The sufficiency of the instructions is challenged by defense, who argues that the law officer should have defined the lesser offenses of involuntary manslaughter and negligent homicide, that he should have instructed on the effect of proof of intoxication upon the specific intent necessary to premeditated murder, and that he should have stated the law as to the affirmative defense of accidental killing.

Decision requires that we examine the evidence to determine whether the lesser offenses and affirmative defenses mentioned were fairly raised as issues by the evidence of record. United States v. Clark (No. 190), 2 CMR 107, decided February 29, 1952; United States v. Roman (No. 191), 2 CMR 150, decided March 19, 1952; United States v. Drew (No. 422), 4 CMR 63, decided July 23, 1952. The three criticisms of the instructions advanced by defense are dependent upon the pres-

ence of evidence to establish either intoxication or an accidental shooting. If neither of these are fairly raised by the evidence, then the law officer was not required to instruct on the effect of intoxication, the elements of involuntary manslaughter and negligent homicide, and the legal definition of accidental homicide.

Turning first to intoxication, we note that the only evidence that the accused was mentally incapacitated consists of the testimony of the company guard that the accused "seemed to me to be drunk," because he "weaved on his feet and his speech was blurred," and the self-serving testimony of the accused that he drank some whiskey in the morning and some wine and beer in the evening just prior to the incident, that he was intoxicated and couldn't remember everything that happened. Opposed to this is the testimony of the witnesses to the killing who stated that the accused appeared to be sober, and the descriptions of the acts and conduct of the accused.

It must be kept in mind that, to reduce premeditated murder to unpremeditated, the accused must be so intoxicated as to be incapable of forming the requisite mental intent to kill. United States v. Roman, supra. Here, even conceding that the accused had been doing some drinking, his actions and conduct are inconsistent with any finding of mental incapacity. He was able to talk coherently, to load a pistol, and to follow directions. His own statement as to intoxication and lapse of memory is inconsistent with his recollection of details such as the drinking, the sequence of events, the remarks made by the Korean women, and the position of the girl he shot. Considering all these circumstances, we cannot say that the law officer erred to the substantial prejudice of the accused in failing to inform the court as to the legal effect of intoxication on the element of specific intent to kill.

We think also that there is insufficient evidence pointing to an accidental killing to require instructions on involuntary manslaughter, negligent homicide, or an explanation of accidental killing. To the contrary the evidence by the accused, his threat voiced to the guard that he planned to kill the woman, his displaying the gun with the hammer back upon entering the house, his threat to shoot another woman, his failure to offer aid to the woman shot or even to examine the extent of her wound, and his statement after the killing that "She asked for it—she got it," are all inconsistent with an accidental killing. It may safely be said that there is nothing in the record pointing to anything other than a deliberate, intentional shooting. Under all these circumstances, we cannot say that the law officer acted in any way unreasonably in not submitting this issue to the court.

Finding no prejudicial error in the instructions of the law officer, we must affirm the decision of the board of review.

Judges LATIMER and BROSMAN concur.